JOHN N. TEDFORD IV (State Bar No. 205537)
*jtedford@dgdk.com*
DANNING, GILL, DIAMOND & KOLLITZ, LLP
1900 Avenue of the Stars, 11th Floor
Los Angeles, California 90067
Telephone: (310) 277-0077
Facsimile:  (310) 277-5735

Attorneys for David A. Gill, Receiver

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

vs.

WESTMOORE MANAGEMENT, LLC; WESTMOORE INVESTMENT, LP.; WESTMOORE CAPITAL MANAGEMENT, INC.; WESTMOORE CAPITAL, LLC; and MATTHEW R. JENNINGS,

Defendants.

Case No. 8:10-cv-00849-AG (MLGx)

**RECEIVER'S FINAL REPORT AND ACCOUNT AND MOTION FOR (1) APPROVAL OF FINAL REPORT AND ACCOUNT, (2) APPROVAL OF FINAL COMPENSATION OF THE RECEIVER AND HIS ATTORNEYS AND ACCOUNTANTS, (3) AUTHORITY TO DISBURSE REMAINING FUNDS ON A PRO RATA BASIS, (4) DISCHARGE OF THE RECEIVER, AND (5) EXONERATION OF THE RECEIVER'S BOND**

**[Declarations of David A. Gill, John N. Tedford, IV, and Susan Tomlinson filed concurrently herewith]**

Date:   August 5, 2019
Time:   10:00 a.m.
Place:  Courtroom 10D
        411 West Fourth Street
        Santa Ana, California

# **TABLE OF CONTENTS**

**Page**

I.     RELIEF REQUESTED .................................................................. 1

II.    BACKGROUND ......................................................................... 3

III.   PROCEDURAL HISTORY OF THIS CASE ................................... 6

IV.    FINAL ACCOUNTING ................................................................ 7

V.     SUMMARY OF ACTIVITIES ....................................................... 8

       A.   PROFESSIONALS EMPLOYED BY ME DURING THE CASE ........ 8

       B.   INITIAL INVESTIGATION AND RECOVERY OF
            WESTMOORE'S BOOKS AND RECORDS .................................. 9

       C.   INVESTIGATION AND DISPOSAL OF WESTMOORE'S
            STOCK IN CHINA TEL, ROCKWALL, AND LILIS ENERGY ........ 11

            1.   China Tel (now VelaTel Global Communications, Inc.) ............ 11

            2.   Rockwall Holdings, Inc. f/k/a Westmoore Holdings, Inc. .......... 13

            3.   Lilis Energy, Inc. f/k/a Recovery Energy, Inc. ...................... 14

       D.   SALES OF REAL PROPERTY ............................................... 14

       E.   NON-LITIGATION RECOVERIES FROM BORROWERS ............... 15

       F.   LAWSUITS AGAINST FORMER BORROWERS,
            EMPLOYEES, INVESTORS AND PROFESSIONALS ..................... 16

            1.   Lawsuit against Former Borrowers (8:12-cv-02236-AG) ........... 17

            2.   Lawsuit against Former Employees (8:12-cv-02235-AG) .......... 17

            3.   Lawsuits against Former Investors (8:13-cv-00132-AG and
                 8:13-cv-01782-AG) .................................................... 18

            4.   Lawsuit against Former Professional (8:13-cv-01156-AG) ........ 19

       G.   WH SUB, LLC'S RESIGNATION AS GENERAL PARTNER
            OF SONATA MULTI-MANAGER FUND, LP .............................. 20

       H.   INCOME TAX RETURNS FILED FOR THE RECEIVERSHIP
            PERIOD ........................................................................ 22

       I.   INCOME TAX RETURNS FILED FOR THE PRE-
            RECEIVERSHIP PERIOD ................................................... 22

1501808.5  25713A

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**
(Continued)

**Page**

VI.    FEES AND COSTS REQUESTED BY MY PROFESSIONALS AND
ME FOR SERVICES RENDERED IN THIS CASE .......................................25

    A.    DAVID A. GILL, RECEIVER .................................................26

    B.    DANNING, GILL, DIAMOND & KOLLITZ, LLP ...........................26

    C.    CASTILLO SNYDER, PC .....................................................27

    D.    CROWE HORWATH, LLP.....................................................28

    E.    PCG CONSULTING ............................................................29

VII.   AUTHORITY TO DISCHARGE RECEIVER.................................................29

VIII.  CONCLUSION ..................................................................................30

David A. Gill, the permanent receiver (the "Receiver") for Westmoore Management, LLC, Westmoore Investment, L.P., Westmoore Capital Management, Inc., Westmoore Capital, LLC, and their subsidiaries and entities otherwise majority-owned, managed or controlled, directly or indirectly, by any of them (collectively "Westmoore" or the "Westmoore Entities"), respectfully submits this *Final Report and Account* (the "Final Report") and represents as follows:

# I.
## RELIEF REQUESTED

This document is (a) my Final Report and (b) my motion for approval of the Final Report and for other relief I am requesting to bring this receivership case to a close. I am hereby requesting entry of an order:

1. Approving this Final Report.

2. Terminating the receivership and discharging me from all further duties, liabilities and responsibilities.

3. Approving, on a final basis, $211,296.00 of fees and $4,074.25 of costs incurred by me in my capacity as receiver, including $9,957.00 of fees and $84.41 of costs incurred from November 1, 2018, through the close of the case.

4. Approving, on a final basis, $1,354,408.50 of fees and $30,055.79 of costs incurred by my general counsel, Danning, Gill, Diamond & Kollitz, LLP ("DGDK"), including $90,450.00 of fees and $2,038.27 of costs incurred from November 1, 2018, through the close of the case.

5. Approving, on a final basis, $752,109.44 of fees and $62,818.16 of costs incurred by my special litigation counsel, Castillo Snyder, PC.

6. Approving, on a final basis, $565,349.50 of fees and $932.28 of costs incurred by my forensic and tax accountants, Crowe Horwath LLP ("Crowe"), including $21,283.50 of fees and $25.27 of costs incurred from November 1, 2018, through the close of the case.

7.     Approving, on a final basis, $482,588.95 of fees and $356.00 of costs incurred by my forensic analyst, investigator and expert witness, PCG Consulting, PC ("PCG").

8.     Authorizing me to distribute remaining funds in the receivership estate to myself, DGDK and Crowe, on a pro rata basis.

9.     Finding that all my acts and transactions during my administration of the receivership estate, including the actions of my employees and agents, be ratified, confirmed and approved as being right and proper and in the best interests of the receivership estate and the parties to this action.

10.     Releasing me and the receivership estate from any and all liability for any and all claims, demands or causes of action that may have directly or indirectly arisen from the receivership estate prior to, during, or after the receivership period, and not brought before the Court before the time of hearing on the Final Report.

11.     Determining that I have no further duty or obligation to prepare or file further tax returns, or pay further taxes, on behalf of the receivership estate.

12.     Authorizing me to abandon remaining assets of the receivership estate.

13.     Releasing from liability any bond hereto filed by me and exonerating the sureties thereon.

14.     Reserving exclusive jurisdiction over any and all claims that may be asserted against me and my professionals and employees for their services, and all issues that were part of the subject matter of the receivership estate.

///
///
///
///
///
///
///

FINAL REPORT AND ACCOUNT

1501808.5  25713A

## II.

## BACKGROUND

Westmoore is a group of companies formed and controlled primarily by Matthew Jennings ("Jennings").  At least on its face, its business model was simple:

- Westmoore Investment, LP ("WM Investment") was formed in 2000. Its primary purpose was to raise funds from investors and use the funds to make equity investments in other companies.[1]

- Westmoore Properties, LP ("WM Properties") was formed in 2002.  Its primary purpose was to raise funds from investors and use the funds to acquire real properties, mostly in the western United States.

- Westmoore Management ("WM Management") was formed in 2003. At least at first, its primary purpose was to manage the businesses of WM Investment, WM Properties, and similar entities.[2]

- Over the years, other investment entities were formed.  In theory, each would raise funds from investors and use the funds to make loans to, or make equity investments in, other companies.  These entities included Westmoore Capital, LLC ("WM Capital"), Westmoore Lending, LLC ("WM Lending"), Westmoore Lending Opportunity Fund, LLC ("WM LOF"), Westmoore Capital Group, LLC ("WMCG"), and Westmoore Income Properties, LLC ("WMIP").

- In 2006, Westmoore acquired an existing broker-dealer.  Its name was changed to Westmoore Trading, and later Westmoore Securities, Inc. ("WM Securities").  This allowed Westmoore to broker investments

---

[1] This entity eventually started using investors' funds to make loans as well.  Its 12/31/08 balance sheet identified eight notes receivable with an aggregate principal balance of about $3.56 million.

[2] WM Management ultimately was used for a variety of things, including to make loans, hold title to real property, and hold equity interests in non-Westmoore Entities. It also was used to generate tens of millions of dollars from Westmoore's investors.

3

FINAL REPORT AND ACCOUNT

1    made by its clients in non-Westmoore Entities (as well as some of the

2    Westmoore Entities) and receive commissions for such services.

3        Generally, Westmoore had two types of investors.  Some investors (which I

4    will refer to as equity-investors) acquired limited partnership interests or ownership

5    units in limited liability companies.  Others (which I will refer to as debt-investors)

6    participated in note offerings or made loans directly to Westmoore.

7        Westmoore does not appear to have started as a Ponzi scheme.[3]  However,

8    because of overly risky investments, fraud, mismanagement, or bad luck (or some

9    combination of these), Westmoore eventually was unable to fulfill its obligations to

10   debt-investors (*e.g.*, interest payments and loan repayments when the notes matured)

11   and equity-investors (*e.g.*, guaranteed dividends).  To postpone defaults, Westmoore

12   convinced its investors to "roll over" their maturing loans into new investments that

13   promised greater returns.  It also used new investors' money to pay its obligations to

14   existing investors.[4]  According to my forensic analyst, Westmoore started operating

15   as a Ponzi scheme no later than 2006.

16       Particularly in 2008, Westmoore offered investments that were too good to be

17   true.  For example:

18       •    In February 2008, a Westmoore Entity offered notes which would earn

19           interest at 5% per month (equivalent to 60% per annum) and mature in

20           only 30 or 60 days.

---

[3] A Ponzi scheme is an investment fraud that pays existing investors with funds collected from new investors.

[4] Not all of the money raised from investors was used to pay other investors.  For example, Westmoore used at least $1.5 million to buy shares in Fund.com, Inc.  The shares had little to no value by the time I was appointed in 2011.  In November 2016, the Delaware Chancery Court appointed a receiver.  *See B.E. Cap. Mgmt. Fund LP v. Fund.com, Inc.*, Case No. 12843-VCL (Delaware Chancery Court)).  The company's principal, Jason Galanis, was sentenced to over 14 years in prison for orchestrating two separate fraudulent schemes.  *See* http://www.justice.gov/usao-sdny/pr/jason-galanis-sentenced-more-14-years-prison-defrauding-tribal-entity-and-pension-funds.

- In May 2008, the same entity offered notes which would earn 5% interest over a 2-week term (equivalent to 130.36% per annum).
- In June 2008, the same entity offered notes which would earn interest at 3.33% per month (equivalent to 40% per annum) and mature in 90 days.
- In September 2008, a different Westmoore Entity offered notes which also would earn interest at 3.33% per month and mature in 3 months.
- In October 2008, the same entity offered notes which would earn 5% interest over a 2-week term (equivalent to 130.36% per annum).

At the same time, WM Management was used to generate millions of dollars by offering very favorable terms.  Just two examples:  In July 2008, one investor loaned $500,000 to WM Management and was promised 7% interest over a 4-week term (equivalent to 91% per annum); and in August 2008, another investor loaned $2 million to WM Management and was promised 3.33% interest over a 30-day term (equivalent to 40% per annum).[5]  Westmoore had no realistic hope of paying these investors back (along with scores of other investors who entrusted Westmoore with new money in the latter half of 2008) without using new money from investors.

By mid-2008, Westmoore's in-house accountants told Jennings they were concerned that the business was unsustainable.  Jennings reportedly dismissed their concerns because Westmoore had invested in a Chinese wireless telecommunications business – China Tel Global Communications, Inc. ("China Tel") – that he believed would eventually provide substantial revenues.  Jennings also told existing investors the same thing in an effort to convince them that Westmoore would be able to pay them in the future.  By September 2008, even Jennings admitted that Westmoore's liquidity problem was "brutal."

---

[5] This appears to be the source of $1.5 million used to invest in Fund.com.

By the end of 2008, the Ponzi scheme could not be sustained.  Westmoore's books reflect that the primary Westmoore Entities owed $60.1 million to more than 230 debt-investors and had over 300 equity-investors (some of whom also were debt-investors) who collectively invested tens of millions of dollars.[6]  Unable to continue, Westmoore ceased its principal operations in January 2009.

### III.
### PROCEDURAL HISTORY OF THIS CASE

On June 15, 2010, the Securities and Exchange Commission (the "SEC") filed a *Complaint for Violations of the Federal Securities Laws* against four Westmoore Entities (collectively the "Westmoore Defendants") and Jennings.[7]  The next day, the Court issued a TRO freezing the Westmoore Defendants' assets.[8]  The TRO was in place until the Court issued a preliminary injunction on September 29, 2010.[9]

On August 12, 2011, the Court entered two judgments.  First, the Court entered its *Final Judgment as to Defendant Matthew R. Jennings* (the "Jennings Judgment").[10]  Among other things, a money judgment was entered in favor of the SEC against Jennings in the amount of $492,265.06.  This amount was supposed to be paid to me within sixty days after entry of the judgment.

Second, the Court entered its *Judgment of Permanent Injunction, Appointment of Permanent Receiver, and Imposing Other Relief As to Defendants Westmoore Management, LLC; Westmoore Investment, L.P.; Westmoore Capital Management,*

---

[6] I have not calculated how much the equity-investors invested.  The Westmoore Entities' balance sheets – which if done properly factored in prior years' allocations of income and losses – reflected that the book value of their investments exceeded $60 million.

[7] Docket no. 1.

[8] Docket no. 9.

[9] Docket no. 36.

[10] Docket no. 81.

6
FINAL REPORT AND ACCOUNT

*Inc.; and Westmoore Capital, LLC* (the "Westmoore Judgment").[11]  This judgment appointed me as permanent receiver with full powers of an equity receiver over the Westmoore Entities' assets.

I have filed six status reports and three separate fee applications detailing the services that my professionals and I have rendered through October 31, 2018.[12]  All of the status reports and fee applications have been posted to my website,[13] and are incorporated herein.

## IV.

## FINAL ACCOUNTING

Exhibit "2" to this Final Report is a summary of all of my receipts and disbursements.  Exhibit "3" contains detailed receipt and disbursement reports for all bank accounts maintained by me during this case.

As reflected in those exhibits, I collected a total of $3,605,491.90 and have disbursed $3,554,483.95.  I have $51,007.95 of cash on hand.

With respect to the receipts:

- • I recovered only $39,779 from Westmoore's deposit accounts and from liquidation of Westmoore's security accounts.

- • Jennings was supposed to pay me $492,265.06 within sixty days after entry of the Jennings Judgment.  He has paid only $244,926.57.

- • Westmoore's receivables were substantial, but most of the borrowers were defunct.  I was able to recover only $299,630 from one borrower

---

[11] Docket no. 83.

[12] *See* dockets nos. 94, 115, 132, 162, 166, 189, 204, 232 and 249.  Services rendered by DGDK, Crowe, and PCG are described in additional fee applications filed by the firms.  *See* docket nos. 167, 168, 169, 205, 206, 207, 250 and 269.

[13] www.westmoorereceivership.com.

FINAL REPORT AND ACCOUNT

1501808.5  25713A

1   without filing a lawsuit, and even then I was required to participate in
2   litigation in the state of Washington.
3   •   I sold three condominiums in Seattle, Washington, and the equity in a
4   house located in Tahoe City, California.  These sales netted $445,519.
5   •   I hired special litigation counsel and filed lawsuits against a number of
6   Westmoore's former borrowers, professionals, employees and investors.
7   I sued over 60 defendants for, in the aggregate, over $46 million.  The
8   results were disappointing.  I was able to net only $1.58 million from
9   the litigation.

10   These receipts have proven insufficient to pay all costs of administration.  For
11   services rendered through October 2018, my attorneys, accountants and I are owed
12   approximately $156,000.  We are also owed fees for services rendered after October
13   31, 2018.  Since I have $51,007.95 of cash remaining, this case is "administratively
14   insolvent."

16   **V.**

17   **SUMMARY OF ACTIVITIES**

18   Details regarding my administration have been provided in prior status reports
19   and fee applications.  A summary of my activities follows.

21   **A.   Professionals Employed by Me During the Case**

22   Pursuant to the Westmoore Judgment and separate orders of the Court, I
23   employed the following attorneys, accountant, and forensic analyst and investigator
24   to assist me in performing my duties in this case.
25   •   At the commencement of the case, I employed Danning, Gill, Diamond
26   & Kollitz, LLP, as my general counsel.
27   •   At the commencement of the case, I employed Crowe Horwath LLP, as
28   my forensic and tax accountant and consultant.

8

FINAL REPORT AND ACCOUNT

- At the commencement of the case, I employed PCG Consultants, PC, as my forensic analyst and investigator, and to provide expert witness testimony if needed in litigation.[14]

- In August 2012, I employed Castillo Snyder, PC ("Castillo Snyder"), as my special litigation counsel to pursue claims against Westmoore's former borrowers, employees, investors and professionals.

**B.   My Initial Investigation and Recovery of Westmoore's Books and Records**

Particularly because of a lack of cooperation by Jennings, the first year of my tenure required extensive effort to collect, review and interpret the substantial amount of information and documents I obtained from the SEC, banks, and other third parties.  This process was very labor intensive.

One of my first tasks was to determine the entities within the scope of the Westmoore Judgment.  Utilizing Court filings, documents provided to me by the SEC, Westlaw, Secretary of State records, and public databases, my attorneys and I investigated the ownership and operations of over 40 entities.  I ultimately identified 26 entities that I believe fall within the scope of the Westmoore Judgment, including some that never conducted business, were no longer conducting business, and/or were not in the "core" group of Westmoore's investment companies.

My initial investigation of Westmoore's organization, assets, liabilities, and financial history would have been much easier if Jennings had cooperated.  However, Jennings was reportedly the subject of a federal criminal investigation.  Thus, at least at first, Jennings "pled the fifth" whenever I asked him for information.

For many months, my primary source of information consisted of documents provided to me by the SEC.  The SEC provided me 12 boxes of binders and papers,

---

[14] I also retained PCG to serve as my field representative.

FINAL REPORT AND ACCOUNT

1501808.5  25713A

mostly relating to the organizational structure of the Westmoore Entities and others that may have been Westmoore Entities.  The SEC also provided me with an external hard drive containing, among other things, over 418,000 scanned documents (about 1.8 million pages),[15] transcripts of the SEC's interviews with some of Westmoore's key personnel and others, and documents produced by Westmoore and others prior to my appointment.  Notably, the hard drive did not contain any QuickBooks files.

Because of Jennings' non-cooperation and the lack of QuickBooks data, I was required to develop a list of creditors, investors, and other parties in interest from the documents available on the external hard drive I received from the SEC.  This was a long and expensive process, requiring the review of balance sheets and other reports which purported to identify all of Westmoore's investors.  I ultimately developed a list that contained over 600 addresses and have maintained the list as more or better information has become available.

Jennings advised me that Westmoore's physical books and records were being stored at an Iron Mountain storage facility and a facility operated by Bear Industrial Supply and Manufacturing, a subsidiary of Rockwall Holdings, Inc. f/k/a Westmoore Holdings, Inc. ("Rockwall").  At Rockwall, many of the boxes were accessible only by forklift.  My field representative went to Rockwall's facility and went through all of the boxes to recover the Westmoore Entities' boxes.[16]  I also received another 50-60 boxes from Jennings.  In all, I recovered approximately 350 boxes of documents which I held in storage facilities until they were recently destroyed.

About four months after my appointment, a local IT company advised me that it had two of Westmoore's servers.  I collected the servers and discovered that one of them had Westmoore's QuickBooks files.  However, I was initially unable to access

---

[15] The hard drive contained over

[16] Rockwall also had non-Westmoore Entities' boxes, so my field representative reviewed all of the boxes and prepared an inventory of all of Westmoore's boxes.

1501808.5  25713A

the files because I did not have the proper passwords.[17]  Eventually, I purchased and installed software to remove the password protection from the QuickBooks files.  In February 2012, I finally had access to the data.[18]  My forensic analyst then was able to commence its investigation of Westmoore's financial activities.

## C. **My Investigation Regarding Westmoore's Stock in China Tel, Rockwall, and Lilis Energy, My Attempt to Sell Rockwall Stock, and My Disposal of Lilis Energy Stock**

Investors who contacted me after my appointment typically pointed to three publicly held companies which, apparently based on statements made by Jennings and others at Westmoore, they believed would generate significant proceeds to pay creditors in this case.  I investigated Westmoore's interests in these companies by, among other things, communicating with the companies and stock transfer agents, and reviewing public filings with the SEC.

### 1. **China Tel (now VelaTel Global Communications, Inc.)**

As of December 1, 2008, certain Westmoore Entities owned about 16.8 million shares of China Tel stock.  Westmoore disposed of virtually all of the shares in 2009 and 2010 (before the SEC filed its complaint).  I sold a small number of shares that were in a brokerage account when I was appointed.  I also sued certain investors to recover the value of the shares they had received.[19]

Because investors had been led to believe that Westmoore's China Tel shares would enable them to be paid, and to investigate potential claims against China Tel,

---

[17] I contacted some of Westmoore's former employees, but the passwords they suggested did not work.

[18] I later learned that the SEC had the QuickBooks files and had meant to include them on the external hard drive provided to me when I was appointed.

[19] Lawsuits I filed against former investors are discussed later in this report.

1501808.5  25713A

my attorneys and I devoted significant time to investigating Westmoore's disposal of the shares. Based on my investigation, I believe the following summarizes the events that led to Westmoore's agreement with China Tel.

In 2008, China Tel sought to raise funds through a convertible note offering. WM Securities was the placement agent for the convertible notes.

It appears that, starting in early 2008, Westmoore and a number of investors agreed that the investors' existing investments (*e.g.*, notes that were about to mature) would be "rolled over" into China Tel's convertible notes. This solved Westmoore's short-term liquidity problem because it did not need to pay its investors when their notes matured; however, it only just kicked the can down the road since Westmoore would eventually need to pay China Tel for the notes. WM Securities delivered the investors' paperwork to China Tel, but told China Tel that it needed 90-150 days to liquidate sufficient assets to transfer the funds. China Tel agreed to issue notes to the investors, but required Westmoore to sign a promissory note for $3,215,063.97 – the aggregate amount of the notes that were issued to the rolled-over investors.

Westmoore did not pay China Tel. In May 2009, Westmoore and China Tel entered into a settlement agreement in which Westmoore agreed to transfer to China Tel over 8 million of Westmoore's own shares of China Tel stock. This would have fully satisfied Westmoore's obligations under the $3.2 million note.

Westmoore did not transfer the shares to China Tel. As a result, in July 2009, China Tel sued Westmoore in Orange County Superior Court. In November 2009, a *Stipulation for Preliminary Injunction and Regarding Mechanics of Resolution with Third-Party Investors* was filed in the case. China Tel and Westmoore agreed that Westmoore owed approximately $2.92 million. They agreed that Westmoore would contact the 33 investors and give each the ability to exchange his, her or its note for Westmoore's own China Tel shares at a rate of 1.5 shares per dollar of principal and interest owed. They also agreed that Westmoore would transfer some of its China Tel shares to China Tel.

FINAL REPORT AND ACCOUNT

1501808.5  25713A

1    All 33 investors accepted the offer.  All told, approximately 8.33 million
2    shares (half of the total number of shares previously owned by Westmoore) were
3    transferred to the 33 investors and to a person designated by China Tel.

4    The stipulation included mutual releases by China Tel and Westmoore.  Thus,
5    by complying with the stipulation, Westmoore satisfied its obligations under the $3.2
6    million note.

7

8    **2.    Rockwall Holdings, Inc. f/k/a Westmoore Holdings, Inc.**

9    Certain Westmoore Entities owned shares of Rockwall stock.  In 2012, I
10   negotiated a sale of the stock to Triple Win Partnership, LLC ("Triple Win"), for
11   $203,018.52 (two cents per share).  At the same time, I negotiated an agreement with
12   an individual who had a security interest in some of the shares and was in possession
13   of the relevant stock certificates.  Under the separate agreement, I agreed to pay the
14   secured party $13,205.34 of the $203,018.52.

15   I filed a motion for approval of the sale and side-agreement, and requested that
16   the sale be free and clear of any existing liens.[20]  I was then contacted by counsel for
17   an alleged lienholder who intended to oppose the motion even though the lienholder
18   might have received some payment from the proceeds.  Around the same time, Triple
19   Win advised me that it no longer wished to acquire Westmoore's shares.  I withdrew
20   my motion and made no further attempts to sell the shares because the shares have
21   little to no value, because they may be encumbered, and because any attempt to sell
22   the shares will require costly litigation.

23

24

25

26   [20] As is customary in bankruptcy cases, I asked that any existing liens attach to
27   the sale proceeds.  Thus, any creditors holding valid, enforceable security interests
     would still retain liens against the proceeds.

28

### 3. Lilis Energy, Inc. f/k/a Recovery Energy, Inc.

In May 2009, Westmoore acquired oil drilling rigs as part of a settlement with a borrower who had defaulted.[21]  Westmoore sold the rigs for $3.25 million, but at the buyer's option the full amount of the debt was converted into shares of stock in a company originally known as Universal Holdings, Inc., then Recovery Energy, Inc., and now Lilis Energy, Inc. ("Lilis").  In late 2009 (*i.e.*, well after it had ceased principal operations), Westmoore bought additional shares for $500,000.

I did not liquidate the Lilis shares for a number of reasons.  Among other things, until recently, there was no efficient market in which to sell the shares for a reasonable price.  Also, the certificates had a legend stating that the shares were "restricted" securities, though Lilis likely would be required to remove the legend upon request.  But even if I could sell them, the sale proceeds would be subject to security interests in favor of certain Westmoore investors who had perfected their security interests by filing UCC-1 financing statements.

I recently entered into a Court-approved agreement pursuant to which I transferred Westmoore's Lilis shares to Jeffrey I. Golden, in his capacity as the chapter 7 trustee for the estate of GM Funding, Inc. (one of the investors who had filed a UCC-1 financing statement).[22]  Pursuant to that agreement, the trustee will sell the shares and distribute the proceeds among the secured parties.

### D. Sales of Condominium Units in Seattle, Washington, and Residential Real Property in Tahoe City, California

My investigation revealed that, over the years, Westmoore Entities owned or controlled various real properties.  However, I concluded that most of the properties

---

[21] The convoluted history of how Westmoore came to own the rigs is described in a motion I filed in November 2018.  *See* docket no. 245.

[22] Docket no. 245 (motion) and 266 (order).

had been foreclosed upon by entities not affiliated with Westmoore.  This was not a surprise, given the condition of real estate markets from 2007 through 2011.  At the time of my appointment, Westmoore owned three condominium units located in Seattle, Washington, and a residence in Tahoe City, California.

I sold the condominium units in 2012.[23]  In the aggregate, the three units were sold for $510,000.  Net of real property taxes, assessments by and judgments in favor of the homeowners' association, real estate brokerage commissions, and ordinary and customary closing costs, I received $415,519.74.

The residence in Tahoe City was appraised for $2.15 million, but the most senior lienholder was owed approximately $3.7 million.  To facilitate a short sale, I agreed to sell the property subject to all existing liens and other encumbrances for $25,000 plus legal fees (up to $5,000) and expenses incurred by me in connection with the transaction.  The Court approved my proposed sale in August 2012.[24]

**E.    Non-Litigation Recoveries from Westmoore's Borrowers**

Prior to my appointment, Westmoore gave the SEC a schedule of assets which listed only five notes receivable in the aggregate amount of $3.4 million.  However, according to Westmoore's balance sheets dated December 31, 2018, there were at that time approximately 40 obligors who owed, in the aggregate, over $30 million.  During my investigation, I determined that many obligors were defunct or otherwise unable to pay, and that Westmoore's balance sheets were not 100% accurate.

I was able to collect a portion of only one receivable without filing a lawsuit.  In September 2008, HW Partners, LLC ("HW Partners"), executed a promissory note in favor of WM LOF for approximately $3.23 million, secured by mortgages on real property in Walla Walla, Washington.  Shortly thereafter, two new investors loaned

---

[23] Docket nos. 106 and 110 (motions) and 108 and 113 (orders).

[24] Docket no. 124 (motion) and 130 (order).

FINAL REPORT AND ACCOUNT

1501808.5  25713A

WM LOF $1 million and were promised 7% interest over a 69-day term (equivalent to 37% per annum).[25]  As security for the $1 million note, WM LOF purported to assign the $3.23 million note and the mortgages to the investors.  When WM LOF failed to pay back the $1 million, the investors filed a complaint against WM LOF, HW Partners, and others.  HW Partners filed a chapter 11 bankruptcy petition one month before I was appointed.

HW Partners' representative and attorney met with me to discuss the loan history and the bankruptcy case, and we discussed the possibility of settlement.  My attorneys participated in the bankruptcy proceedings by telephone, and attended an in-person mediation in Yakima, Washington, to try to facilitate a global settlement. The matter did not settle at that time, but I ultimately reached a settlement with the former Westmoore investors and brought $299,630 into the receivership estate.[26]

## F.    Lawsuits Against Westmoore's Former Borrowers, Employees, "Net Winner" Investors, and Professionals

In 2012, I hired Castillo Snyder as my special litigation counsel to investigate and pursue claims against Westmoore's former borrowers, employees, investors and professionals.  Castillo Snyder was already familiar with Westmoore's case because it was representing two of Westmoore's investors, Joaquin De Teresa and Ana Alicia Aguilar De Teresa (the "De Teresas").

Based upon Castillo Snyder's analyses and recommendations, I decided to file suit against those against whom I could assert claims of approximately $150,000 or more.  Starting in late 2012, I filed 5 lawsuits seeking money judgments against over 60 defendants.

---

[25] Westmoore had no realistic hope of paying the $1 million back without using new investors' funds.

[26] Docket nos. 153 (motion) and 160 (order).

From the inception, we knew that the amount I would be able to recover was very speculative.  We anticipated that some defendants would be able to identify valid defenses to all or a part of my claims (though those defenses were unknown to me when the complaints were filed).  We also expected to discover that some of the corporate defendants were defunct.  We also expected to learn that many defendants would not be able to pay any judgment I might obtain, and therefore I was prepared to settle for smaller amounts if defendants provided satisfactory evidence of their inability to pay.  Of course, we also anticipated that some defendants would seek to test my conclusion that Westmoore became a Ponzi scheme no later than 2006.

### 1.     Lawsuit against Former Borrowers

In this lawsuit, I sought judgments against 25 defendants who borrowed money from Westmoore but failed to pay all or a portion of the money back.  In the aggregate, my first amended complaint sought judgments totaling over $29 million.  I also sought judgments against two individual defendants on the theory that loans made by Westmoore to the individual defendants' corporate entities were fraudulent transfers and the individuals were subsequent transferees.

Ultimately, I settled with 5 of the defendants.  My claims against all of the other defendants were dismissed for various reasons.  I received $627,500 from the settling defendants.[27]  After paying my special litigation counsel's contingency fees and expenses, my net recovery from this lawsuit was $418,542.

### 2.     Lawsuit against Former Employees

In this lawsuit, I sought judgments against 10 defendants who used to work for Westmoore, including Jennings.  I sued to recover over $5.6 million, consisting of

---

[27] One settling defendant still owes $12,000.  I believe the cost of attempting to collect the balance would likely exceed any further recovery.

commissions paid to them as employees, and transfers made to them as investors, after January 1, 2007.  I asserted additional claims against four defendants for breach of fiduciary duty, on the theory that they should be held responsible for damages they caused to all of Westmoore's investors.

I settled with Jennings for $5 million.  Pursuant to Court authority, I have assigned the judgment to the SEC.[28]

Ultimately, I settled with 8 of the other 9 defendants.  I received $47,000 from 3 of the settling defendants.  After paying my special litigation counsel's contingency fees and expenses, my net recovery from this lawsuit was $27,913.

The other six settling defendants did not make a cash payment, but waived their claims against Westmoore.  Anticipating that I might need their testimony in the future, some settlements required the defendants to cooperate with me in all of my future liquidation and litigation activities, including by appearing for depositions without the need for a subpoena.

### 3.  **Lawsuits against Former Investors**

In two lawsuits, I sought judgments against 20 non-employee investors who received payments from Westmoore and appeared to be "net winners."  I sued them based on law which provides that payments made by a Ponzi scheme to net winners are avoidable fraudulent transfers.  In the aggregate, my first amended complaint sought judgments totaling over $11.3 million.

Ultimately, I settled with 10 of the defendants.  I received $1,542,500 from 8 of the settling defendants, including $1.2 million from a group of 4 defendants.  After paying my special litigation counsel's contingency fees and expenses, my net recovery from these lawsuits was $1,000,476.

---

[28] Docket nos. 153 (motion) and 264 (order).

FINAL REPORT AND ACCOUNT

1501808.5  25713A

### 4.   Lawsuit against a Former Professional

Often, receivers appointed for Ponzi scheme perpetrators sue attorneys, accountants, financial advisors, and other professionals who actively participated in the Ponzi scheme, especially if audited financial statements or similar documents were provided to potential investors.  Professionals often have sizeable insurance policies which fund distributions to victims of the Ponzi scheme.

Many Westmoore investors purchased loans or equity pursuant to offerings described in private placement memoranda prepared, at least in part, by Westmoore's outside legal counsel.  While the memoranda contained various disclosures and listed various risk factors, I believe they did not always adequately disclose how investors' funds would be used or disclose all relevant risk factors (particularly those regarding Westmoore's growing risk of insolvency).  Also, demonstrating the extent to which the firm was involved, in some cases investors were told to wire their funds directly into the law firm's attorney-client trust account instead of a Westmoore account.  My understanding is that millions of dollars of investors' funds flowed through the law firm's account(s).

Westmoore had tax accountants, but does not appear to have regularly used letters or statements from accountants or financial auditors when soliciting investors. As a result, it appeared that the only professional against which I could assert claims was Westmoore's former counsel.

On July 31, 2013, the De Teresas and I filed a joint complaint against the law firm and two attorneys who were primarily responsible for representing Westmoore. I sought to recover over $2.2 million in transfers made to the firm during 2007 and 2008, plus $738,250 attributable to China Tel stock transferred to the firm in 2009 and 2010 (possibly as payment of legal fees).

Unfortunately, the firm lacked insurance that would have paid any judgment obtained in the lawsuit.  As a result, settlement discussions focused heavily on the defendants' ability to pay.

1501808.5  25713A

1   Ultimately, we settled with the defendants for $275,000.  Of this amount,
2   $25,000 was used to reimburse the De Teresas for funding Castillo Snyder's pre-
3   filing investigations, $55,769.41 was paid to the De Teresas for their share of the
4   settlement proceeds, and $64,109.32 was paid to Castillo Snyder.  Thus, my net
5   recovery from this lawsuit was $130,121.27.

6

7   **G.   WH Sub, LLC'S Resignation As General Partner of Sonata Multi-**
8   **Manager Fund, LP**

9   Sonata Multi-Manager Fund, LP ("Sonata"), is an investment fund that made
10  investments in various entities, including certain Westmoore Entities.  According to
11  the Westmoore Entities' balance sheets dated December 31, 2008,[29] the outstanding
12  principal amount of Sonata's investments in the Westmoore Entities exceeded $5.8
13  million.  Thus, Sonata is a victim of Westmoore's Ponzi scheme.

14  Sonata was previously managed by its general partner, Waters Capital
15  Advisors, LLC, n/k/a WH Sub, LLC ("WCA").  WCA held a nominal partnership
16  interest in Sonata.  Sonata's investors received limited partnership interests in
17  exchange for their investments.

18  In December 2007, WM Investment acquired a 51% ownership interest in
19  WCA.  In or about January 2008, WM Investment acquired the remaining 49%.

20  My understanding is that the former principal of WCA, James Waters
21  ("Waters"), continued to manage Sonata through another company, Greenstreet
22  Advisors, LLC ("Greenstreet").  Greenstreet's services were terminated in August
23  2009.  It appears that Sonata was then managed by Paladin Capital Partners until it
24  resigned soon after I was appointed.

25

26

27  [29] Generally, Westmoore's principal operations ceased in early January 2009.

28

1    Sonata had already made sizeable investments in Westmoore before

2   Westmoore acquired WCA.[30]  In February and July 2008, Sonata invested a total of

3   $3.15 million in WMCG.  These transfers give the impression that Westmoore used

4   Sonata to raise funds for its own benefit.  I do not know whether Sonata's investors

5   (some of which also invested in Westmoore) knew that their funds were being used

6   in this way.

7    Curiously, while Sonata was investing in Westmoore, Westmoore was

8   investing in Sonata.  The most notable transactions occurred on July 1, 2008.  On

9   that date, Sonata wired $650,000 into one of WMCG's accounts.  Westmoore's

10  records reflect that this was an investment by Sonata in a note that bore interest at

11  3.33% per month.[31]  The exact same day, $650,000 was wired to Sonata from an

12  account held in the name of WM Securities.  Westmoore's records reflect that this

13  was an equity investment by WM Securities in Sonata.  Essentially, in exchange for

14  a limited partnership interest of questionable value in Sonata, Westmoore agreed to

15  pay Sonata $21,645 per month[32] and incurred a $24,375 commission.[33]

16   I determined that, overall, Sonata invested much more in Westmoore than

17  Westmoore invested in Sonata, making Sonata a claimant against the receivership

18  estate.  To avoid any conflict of interest, I caused WCA to resign as the general

19  partner of Sonata and sent multiple notices to Sonata's limited partners advising

20  them of the need for one or more of them to become general partners, or to retain a

21  liquidating agent.  No limited partner has ever volunteered.

22

23   [30] For example, in early 2007, Sonata invested $1.5 million in WM LOF.

24   [31] WMCG Series A transferred at least $500,000 of the $650,000 to investors I later sued.

25   [32] With respect to $1.15 million invested by Sonata in July 2008, WMCG paid Sonata a total of $120,554.35 of interest from July through November 2008.

26
27   [33] Because the investment was run through WM Securities, one of its brokers was owed a $24,375 commission (3.75% of the amount invested).  However, it is unclear whether the commission was actually paid.

28

## H.    Income Tax Returns Filed for the Receivership Period

For federal and state income tax purposes, the receivership estate is treated as a separate taxable entity called a Qualified Settlement Fund ("QSF").  Federal and state income tax returns must be prepared and filed, and the appropriate tax paid, for the QSF for each taxable year that the receivership exists.  For income tax purposes, all economic activity of the receivership entities and the receivership estate after the commencement of the receivership must be reflected in the QSF's returns.

Throughout the receivership period, I have timely filed all of the QSF's federal and California income tax returns.  The QSF incurred no federal income tax liability.  Its California income tax liability has been limited to the minimum franchise tax of $800 per year.  Prior to the filing of this Final Report, I filed the QSF's final federal and California income tax returns.

## I.    Income Tax Returns Filed for Pre-Receivership Periods

Generally, a receiver is required to file tax returns and pay any taxes owed for pre-receivership periods before making distributions to non-administrative creditors.  This is so because a receiver may be held personally liable for taxes owed by the receivership estate or the receivership entities, even with respect to pre-receivership periods, if the receiver pays creditors that rank junior in priority to the government instead of paying the government's senior claims.[34]

Early on, it was clear that the cost of preparing pre-receivership tax returns would be substantial and that the receivership estate did not have sufficient funds to pay for the undertaking.  Among other things, my accountants, attorneys and I would need to identify the "core" group of Westmoore Entities with creditors who could be

---

[34] *See* 31 U.S.C. § 3713.  Administrative expenses, such as fees incurred by a receiver and his or her professionals, court costs, and expenses incurred in operating a business have priority over pre-receivership tax debts.

1   entitled to payment from the receivership estate.  With assistance from the IRS and
2   FTB, my accountants would need to determine the last year in which those entities
3   filed tax returns, and obtain copies of the returns to ensure that information provided
4   in my returns was consistent with the prior returns.  Of course, my accountants also
5   would be required to use Westmoore's financial records to prepare returns.  If the
6   financial records were inaccurate or in any other way insufficient, my accountants
7   also would be required to reconstruct the records to ensure that my pre-receivership
8   returns were as accurate as possible.

9       In my early status reports, I advised that because of the lack of funds in the
10  receivership estate, and because of uncertainty that the receivership estate would ever
11  have sufficient funds to pay non-administrative claims, I had not commissioned pre-
12  receivership tax returns.  In August and November 2014, I reached settlements under
13  which the receivership estate would receive $500,000 and $1.2 million, respectively.
14  Only when those settlements were fully paid (in November 2015) did it appear that I
15  might have sufficient funds to make a distribution.

16      I therefore instructed Crowe to prepare income tax returns for pre-receivership
17  periods.  This process took longer than expected, in part because Crowe was required
18  to reconstruct some of Westmoore's records.

19      The process of preparing returns for WMCG was particularly troublesome.
20  The taxpayer identification number used for WMCG's federal returns was different
21  than the number used for its California returns, so even just figuring out when that
22  entity stopped filing its California returns was more difficult than we expected.  For
23  many months, the Franchise Tax Board ("FTB") advised me that WMCG had not
24  filed returns for 2007, so Crowe prepare returns for 2007 through 2011.  Initial draft
25  returns reflected that substantial amounts of income would be imputed to WMCG's
26  equity investors.  Crowe revised the returns to lessen the adverse impact on investors.
27  Then, before those returns were filed, the FTB advised me that WMCG had, in fact,
28  filed 2007 returns.  I requested copies of the returns from the FTB, but it was unable

23

FINAL REPORT AND ACCOUNT

1    to do so promptly.  During this process, we learned that Westmoore had not used its

2    usual accountant to prepare WMCG's 2007 returns.  Fortunately, the accountant was

3    still in business and was able to locate the 2007 returns in its records.  Crowe then

4    was required to re-re-revise the returns for 2008 and later years so they would be

5    consistent with the filed 2007 return.

6         Crowe prepared tax trial balances, reconciliations of partner capital and

7    partner capital accounts, and 118 federal and state income tax returns for the 2007

8    through 2011 tax years.[35]  As a result of these efforts, I fulfilled my obligation to file

9    pre-receivership returns for the appropriate Westmoore Entities and distribute K-1s

10   to investors.

11        Based on the returns, the IRS and FTB would be entitled to payment of taxes,

12   and possibly penalties, before any payment could be made to creditors and investors.

13   In particular:

14   •    The IRS is owed approximately $29,308.12 of income taxes.[36]

15   •    The FTB is owed approximately $298,927.52 of income taxes, primarily

16        consisting of the minimum franchise tax owed by each entity for each

17        year (through 2011), taxes incurred by WM Securities, and late-filing

18        penalties.

19   •    Even though Westmoore's assets all became part of the QSF and I have

20        timely filed all of the QSF's tax returns, the FTB has continued to assess

21        the minimum tax ($800) against the Westmoore Entities for each year of

22

23   [35] I filed pre-receivership income tax returns for (1) Westmoore Business
     Development, LLC, (2) WM Properties, (3) WM Capital, (4) WM Management,
24   (5) WM LOF, (6) Westmoore Income Properties, LLC, (7) WM Securities, (8) WM
     Investment, (9) WM Lending, (10) Westmoore Capital Management, LLC,
25   (11) Westmoore Capital Finance, LP, (12) WMCG – Series A, (13) WMCG – Series
     B, (14) WM Capital Group – Series II, and (15) WM Capital Group – China Series.

26   [36] Most of the Westmoore Entities were "pass-through" entities for income tax
     purposes.  Therefore, for most of the Westmoore Entities, income and losses were
27   reported to investors on K-1s.

28

the post-receivership period.  The FTB also assessed penalties for those years, and asserts that interest is accruing.  Since the receivership estate reports income and expenses (and pays taxes) through the QSF, I do not believe that the FTB may assert a claim against the receivership estate for such taxes, penalties and interest.  However, it is unnecessary to litigate the issue since the estate lacks funds to pay creditors.

• Both the IRS and the FTB are owed interest on the unpaid taxes.  Also, because the tax returns were filed late, both the IRS and FTB assessed substantial late filing penalties.  Until I was certain that there would not be sufficient funds to make distributions to Westmoore's investors, I requested that the IRS and FTB abate the penalties, and they agreed to do so.  I did not incur the time and expense of requesting abatement for more recently assessed penalties because the estate lacks funds to pay any portion of the taxes, penalties and interest.

Because the balance of the receivership estate's funds will be distributed to professionals when this case is concluded, it is important that the receivership estate and I have certainty and finality regarding tax-filing requirements for the Westmoore Entities.  Accordingly, I am requesting that the order approving this Final Report and discharging me as receiver also provide that the receivership estate is not responsible for filing any further tax returns and paying any additional taxes.

## VI.

### FEES AND COSTS REQUESTED BY MY PROFESSIONALS
### AND ME FOR SERVICES RENDERED IN THIS CASE

For services rendered by me, DGDK and Crowe from October 1, 2018 through the close of the receivership case (the "Final Period"), I am requesting that the Court approve the fees and costs described below and in the accompanying declarations.  I

FINAL REPORT AND ACCOUNT

1501808.5  25713A

1   am also requesting that the Court approve, on a final basis, all fees and costs incurred

2   by me and my professionals throughout this case.

3

4   **A.**    **David A. Gill, Receiver**

5       My services rendered in this case are billed at the rate of $450 per hour.  The

6   regular hourly rate charged by DGDK for services rendered by me as an attorney was

7   most recently $695 per hour.  As a result, the amount billed by me to the receivership

8   estate during this case was significantly less than would have been billed otherwise.

9       On an interim basis, I have been paid the following amounts for services

10   rendered by me and my staff during the following time periods:

11

| Period | Fees | | Expenses | |
|---|---|---|---|---|
| | Allowed | Paid | Allowed | Paid |
| 7/27/11-3/30/12 | $51,876.50 | $51,876.50 | $553.89 | $553.89 |
| 4/1/12-9/30/13 | $27,282.50 | $27,282.50 | $911.84 | $911.84 |
| 10/1/13-4/30/15 | $91,530.50 | $91,530.50 | $2,065.54 | $2,065.54 |
| 5/1/15-10/31/18 | $30,649.50 | $15,022.91 | $478.57 | $478.57 |
| | **$201,339.00** | **$185,712.41** | **$4,009.84** | **$4,009.84** |

15 Thus, I have been allowed, but have not been paid, fees of $15,626.59.

16       For the Final Period, I have incurred fees of $9,957.00 and costs of $84.41.

17 My detailed billing entries for the Final Period are attached to my declaration.

18

19   **B.**    **Danning, Gill, Diamond & Kollitz, LLP**

20       On an interim basis, DGDK has been paid the following amounts for services

21 rendered during the following time periods:

22

| Period | Fees | | Expenses | |
|---|---|---|---|---|
| | Allowed | Paid | Allowed | Paid |
| 7/27/11-3/30/12 | $288,696.00 | $288,696.00 | $10,726.46 | $10,726.46 |
| 4/1/12-9/30/13 | $409,081.00 | $409,081.00 | $6,001.37 | $6,001.37 |
| 10/1/13-4/30/15 | $433,139.00 | $433,139.00 | $9,239.81 | $9,239.81 |
| 5/1/15-10/31/18 | $133,042.50 | $34,942.47 | $2,049.88 | $2,049.88 |
| | **$1,263,958.50** | **$1,165,858.47** | **$28,017.52** | **$28,017.52** |

26 Thus, DGDK has been allowed, but has not been paid, fees of $98,100.03.

27

28

1  For the Final Period, DGDK has incurred fees of $90,450.00 and costs of
2  $2,038.27.  DGDK's detailed billing entries for the Final Period are attached to the
3  Declaration of John N. Tedford, IV.

4

5  **C.      Castillo Snyder, PC**

6  Although DGDK could have litigated claims against Westmoore's former
7  borrowers, employees, investors and professionals on an hourly-fee basis, I believed
8  that the receivership estate could incur less fees if I were to retain special litigation
9  counsel to investigate and pursue such claims.  I negotiated with Castillo Snyder, the
10  De Teresas (investors who Castillo Snyder represented before I was appointed), and
11  the SEC regarding my proposed retention of Castillo Snyder as my special litigation
12  counsel.  The terms of Castillo Snyder's employment were set forth in Exhibit "2" to
13  my motion for authority to employ the firm.[37]

14  Castillo Snyder's engagement was divided into two phases.  First, the firm
15  investigated potential claims.  The receivership estate was not initially required to
16  fund the investigation.  Instead, the De Teresas agreed to fund the investigation and
17  be reimbursed by the receivership estate if I was able to collect anything on account
18  of the claims.

19  Second, if I decided to pursue claims, the firm would represent me in
20  prosecuting the claims.  The firm advanced litigation costs and was entitled to be
21  paid a percentage-based fee from net collections.  The amount of the fee varied:

22  •      If a claim was settled after demand for payment but before a lawsuit was
       filed, the fee was 20% of the net proceeds;

23
24  •      If a claim was settled after a lawsuit was filed but before depositions
       commenced, the fee was 25% of the net proceeds;

25  •      If a claim was settled after depositions commenced and up to 30 days
26       prior to trial, the fee was 30% of the net proceeds;

27  ───────────────
   [37] Docket no. 127.

28

- • If a claim was settled within 30 days prior to trial, during trial, or as a result of a favorable verdict or judgment at trial, the fee was 35% of the net proceeds; and

- • If a claim was settled following briefing on the merits of any appeal of a favorable judgment, the fee was 40% of the net proceeds.

For almost all of my settlements, Castillo Snyder was entitled to receive 25% or 30% of the net recovery.  For the largest settlement ($1.2 million), Castillo Snyder was entitled to receive 35% of the net recovery.

I collected an aggregate of $2,492,000 pursuant to 16 settlement agreements. From these collections:

- • I reimbursed the De Teresas $50,000 for fees they paid to Castillo Snyder to fund the firm's initial investigation.

- • I paid the De Teresas $55,769.41 for their share of the settlement proceeds received from Westmoore's former attorneys.

- • I reimbursed Castillo Snyder $57,069.06 for costs advanced by the firm and its local counsel.

- • I paid Castillo Snyder fees of $752,109.43.

Overall, Castillo Snyder received approximately 31.5% of the amounts I collected. The net recovery to the estate was $1,577,052.09.

## D.   Crowe Horwath, LLP

On an interim basis, Crowe has been paid the following amounts for services rendered during the following time periods:

| Period | Fees | | Expenses | |
|---|---|---|---|---|
| | Allowed | Paid | Allowed | Paid |
| 8/19/11-9/30/13 | $78,152.50 | $78,152.50 | $72.99 | $72.99 |
| 10/1/13-6/20/15 | $12,728.50 | $12,728.50 | $98.16 | $98.16 |
| 6/21/15-10/31/18 | $453,185.00 | $410,958.23 | $735.86 | $735.86 |
| | **$544,066.00** | **$501,839.23** | **$ 907.01** | **$ 907.01** |

Thus, Crowe has been allowed, but has not been paid, fees of $42,226.77.

1501808.5  25713A

For the Final Period, Crowe has incurred fees of $21,283.50 and costs of $25.27.  Crowe's detailed billing entries for the Final Period are attached to the Declaration of Susan Tomlinson.

**E.      PCG CONSULTING**

On an interim basis, PCG has been paid the following amounts for services rendered during the following time periods for services rendered as my forensic analyst, investigator and expert witness:

| Period | Fees | | Expenses | |
|---|---|---|---|---|
| | Allowed | Paid | Allowed | Paid |
| 1/23/12-4/12/12 | $7,373.00 | $7,373.00 | $0.00 | $0.00 |
| 4/16/12-10/6/13 | $130,831.20 | $130,831.20 | $0.00 | $0.00 |
| 10/7/13-4/30/15 | $344,384.75 | $344,384.75 | $356.00 | $356.00 |
| | **$482,588.95** | **$482,588.95** | **$ 356.00** | **$ 356.00** |

PCG has not incurred fees and costs since April 30, 2015.  Therefore, PCG has been paid in full and is not seeking approval of any additional fees and costs.

**VII.**

**AUTHORITY TO DISCHARGE RECEIVER**

A receiver may be discharged upon his motion for approval of his final report and account.  Local Rule 66-7 provides that a receiver must give notice by mail to all parties to the action and to all known creditors of the receivership estate of the time and place for hearing of, among other things, reports of the receiver, applications for discharge of the receiver, and applications for fees and expenses of the receiver, the attorney(s) for the receiver, and any other person appointed to aid the receiver.[38]

Because of the substantial number of investors and other potential creditors, the Court has entered an order in this case limiting the notice required to be given by

---

[38] Local Rule 66-7 states that Local Rule 6-1 applies to the notice.  Local Rule 6-1 states that notice, if given by mail, must be given 31 days before the hearing date.

me under Local Rule 66-7.[39]  With one exception, the order authorizes me to serve notices of all petitions, applications and motions, and the time and place for hearing thereof, by posting notices on www.westmoorereceivership.com.  The order provides that service of notices are deemed complete when posted on the website.

Nevertheless, I am filing a separate notice of this Final Report.  I will serve the notice by mail to over 680 addresses included on the mailing list I have maintained during this case.  I also will post a copy of the notice, as well as a copy of this Final Report and accompanying declarations, on my website.

## VIII.

## CONCLUSION

For the foregoing reasons, I respectfully request that the Court enter an order:

1.      Approving this Final Report.

2.      Terminating the receivership and discharging me from all further duties, liabilities and responsibilities.

3.      Approving, on a final basis, $211,296.00 of fees and $4,074.25 of costs incurred by me in my capacity as receiver, including $9,957.00 of fees and $84.41 of costs incurred during the Final Period.

4.      Approving, on a final basis, $1,354,408.50 of fees and $30,055.79 of costs incurred by DGDK, including $90,450.00 of fees and $2,038.27 of costs incurred during the Final Period.

5.      Approving, on a final basis, $752,109.44 of fees and $62,818.16 of costs incurred by Castillo Snyder.

---

[39] Docket no. 104.

FINAL REPORT AND ACCOUNT

6.      Approving, on a final basis, $565,349.50 of fees and $932.28 of costs incurred by Crowe, including $21,283.50 of fees and $25.27 of costs incurred during the Final Period.

7.      Approving, on a final basis, $482,588.95 of fees and $356.00 of costs incurred by PCG as my forensic analyst, investigator and expert witness.

8.      Authorizing me to distribute remaining funds in the receivership estate to myself, DGDK and Crowe, on a pro rata basis, in partial satisfaction of approved administrative fee claims.

9.      Finding that all my acts and transactions during my administration of the receivership estate, including the actions of my employees and agents, be ratified, confirmed and approved as being right and proper and in the best interests of the receivership estate and the parties to this action.

10.     Releasing me and the receivership estate from any and all liability for any and all claims, demands or causes of action that may have directly or indirectly arisen from the receivership estate prior to, during, or after the receivership period, and not brought before the Court before the time of hearing on the Final Report.

11.     Determining that I have no further duty or obligation to prepare or file further tax returns, or pay further taxes, on behalf of the receivership estate.

12.     Authorizing me to abandon remaining assets of the receivership estate.

13.     Releasing from liability any bond hereto filed by me and exonerating the sureties thereon.

///
///
///
///
///
///
///

14. Reserving exclusive jurisdiction over any and all claims that may be asserted against me and my professionals and employees for their services, and all issues that were part of the subject matter of the receivership estate.

DATED:  June 2/, 2019             
            DAVID A. GILL, Receiver

**PRESENTED BY:**

DANNING. GILL. DIAMOND & KOLLITZ. LLP


By: */s/ John N. Tedford IV*
   JOHN N. TEDFORD IV
   Attorneys for David A. Gill. Receiver

FINAL REPORT AND ACCOUNT